UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

UNITED STATES OF AMERICA,

    - against -

                                      **MEMORANDUM & ORDER**

JONATHAN P. FLOM,                        14-CR-507 (RRM)

                Defendant.

--------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

      Following a jury trial, defendant Jonathan P. Flom was found guilty of money laundering in violation of 18 U.S.C. § 1956(a)(3). Flom moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure ("Rule") 29 and a new trial pursuant to Rule 33. (*See* Post-Trial Mot. (Doc. No. 74).) The government opposes the motion. (Govt.'s Opp'n (Doc. No. 79).) For the following reasons, the Court denies Flom's motion in its entirety.

**BACKGROUND**

I.      **Pre-Trial Proceedings**

      **A. The Allegations**

      On September 22, 2014, a grand jury returned an indictment charging the defendant Jonathan P. Flom, a licensed attorney, with one count of money laundering in violation of 18 U.S.C. § 1956(a)(3)(A). The indictment alleged, *inter alia*, that in or about September 2013, Flom met with an undercover FBI agent using the fictitious name "Max Larsen" ("Larsen" or the "UC"), who was posing as a person engaged in the sale of fraudulent stock certificates to investors. Flom was introduced to Larsen by Cecil Franklin Speight, an individual with whom Flom had been involved in a prior, uncharged money laundering scheme (the "Speight Scheme"). Flom agreed to participate in a scheme with Larsen (the "UC Scheme"), one modeled on the Speight Scheme, to launder proceeds of the sale of fake stock certificates. Between

December 2013 and April 2014, Flom received over $141,000 in checks and wire transfers into his bank account – funds that he believed to be the proceeds of fraudulent stock sales, but were in fact sent from covert FBI accounts. Flom transferred these funds, minus a 5% fee, to an account maintained in Queens, New York that, unbeknownst to Flom, was controlled by the FBI.

### B. Motion to Change Venue

Flom moved to change the trial venue from the Eastern District of New York (the "EDNY") to the Southern District of Florida, pursuant to Rule 21(b). (*See* Mot. Change Venue (Doc. No. 20).) Following full briefing from both parties and oral argument, the Court issued a Memorandum and Order denying Flom's motion, holding that Flom had not met his burden of demonstrating that a trial in the EDNY was so unduly burdensome as to overcome the presumption in favor of retaining a criminal prosecution in the district in which it was initially filed. *See United States v. Flom*, No. 14-CR-507, 2015 WL 6506628, at *2–3, 10–11 (E.D.N.Y. Oct. 27, 2015). In denying Flom's motion, the Court found, *inter alia*, that Flom had not shown with specificity the burdens any potential defense witness would face by travelling to New York. *See id.* at *4–5. The Court noted that any factors that weighed in favor of transfer were largely mitigated by the expected short length of the trial, and that the "strong nexus to and impact on New York through the evidence and witnesses" as well as the interests in "judicial economy borne of the related cases" supported keeping the case in the EDNY. *Id.* at *10–11.

### C. Motion to Admit Evidence of Prior Money Laundering Scheme

Prior to trial, the government moved *in limine* pursuant to Rule 404(b) to admit evidence of Flom's involvement in the Speight Scheme, a prior uncharged money laundering scheme with Cecil Franklin Speight. (*See* Govt.'s Mot. Lim. (Doc. No. 32).) As discussed more fully *infra*, the government intended to demonstrate through recordings, emails, witness testimony, and other evidence that Flom knowingly engaged in the Speight Scheme, which was the model for the

2

charged UC Scheme. (*See id.*) According to the government, Speight, the former president and sole owner of registered transfer agent International Stock Transfer, Inc. ("IST"), engaged in an offering fraud in which he and those acting on his behalf solicited potential investors and offered them high-yield investments. (*See id.* at 2–3; *see also* 6/21/16 Tr. at 141:8–144:22.)[1] These victim investors would be instructed to send their money to bank accounts maintained by licensed attorneys, including Flom, to give the transactions an air of legitimacy. (*See* Govt.'s Mot. Lim. at 2–3.) The licensed attorneys would then take a percentage of the proceeds and transfer the remainder to bank accounts controlled by Speight. (*See id.*)

By the end of Summer 2013, FBI agents approached Speight regarding his role in the Speight Scheme, and in an effort to cooperate with law enforcement, Speight agreed to introduce Larsen to Flom. (*See id.*) On September 19, 2013, Speight informed Flom that he would like to introduce him to "a guy that's gotta group" who does the "same thing" as was done in the Speight Scheme, *i.e.*, had the "same, you know set up where the money has to come through you and you get a fee." (*See* GX 100-A-T at 1:21–2:6.) Over the next several months, Speight, Larsen, and Flom had several conversations to discuss the implementation of the money laundering scheme charged in the instant case – the UC Scheme. (*See* Govt.'s Mot. Lim. at 2–3.) The government presented evidence of those conversations where Flom, Larsen, and Speight discussed how the UC Scheme would operate in the same manner as the Speight Scheme and would use the same fraudulent stocks, Adfitech and Altmark, as the Speight Scheme. (*See id.*)

In its motion *in limine*, the government moved to admit evidence of the Speight Scheme under two theories: (1) as direct evidence of Flom's involvement in the UC Scheme because it establishes the background of how Larsen met Flom and how the UC Scheme began; and (2)

---

[1] For ease of reference, citations to Court documents utilize the Electronic Case Filing System ("ECF") pagination.

under Federal Rule of Evidence 404(b) ("Rule 404(b)") as proof of Flom's intent, knowledge, and the absence of any mistake or accident in his use of the same bank account in the UC Scheme as he used in the Speight Scheme. (*See id.* at 3–6.) The government argued that there was no danger of undue prejudice to Flom because the evidence of Flom's money laundering as part of the Speight Scheme was no more serious or sensational than the evidence of Flom's money laundering as part of the UC Scheme. (*See, e.g.*, *id.* at 6–7.) Moreover, the government argued that even if there was a risk of undue prejudice, a limiting instruction could mitigate such risk. (*See id.*) Flom opposed the motion, and requested that if the Court were to admit the evidence, that it also provide a limiting instruction. (*See generally* Def.'s Opp'n Mot. Lim. (Doc. No. 43).)

After full briefing and oral argument, the Court granted the government's motion *in limine* to admit evidence of the Speight Scheme pursuant to Rule 404(b). (*See generally* 6/16/16 Tr.) The court held that evidence of the Speight Scheme was admissible because it was probative and relevant to how Flom came to meet and trust Larsen and to Flom's knowledge of the UC Scheme's fraudulent nature. (*See* 6/16/16 Tr. at 14:6–15:10.) The UC Scheme was modeled on the Speight Scheme, came about through Speight's introduction of Flom to Larsen, involved the same certificates as the Speight Scheme, and involved Flom playing the same role and using the same account as he did in the previous scheme – albeit receiving a greater fee for his efforts. The Court also held that witness testimony from Robert Thibault, a former investigator with the Royal Bank of Canada ("RBC") who informed Flom that his account was being closed because RBC believed it was being used for the illegal sale of "bogus securities," was admissible to show that Flom had been placed on notice of the Speight Scheme's fraudulent nature. (*See id.* at 17:11–24:4, 26:11–36:4.) The Court gave a limiting instruction – modeled largely after the one requested by Flom's counsel – both during the presentation of evidence and

during the closing charge to the jury.[2]  (*See* 6/22/16 Tr. at 523:15–524:19; 6/24/16 Tr. at 827:10–828:10.)

### D.  Conscious Avoidance Instruction

The government also requested that the jury be given a conscious avoidance instruction. (*See* 6/22/16 Tr. at 441:15–442:4.)  After full briefing and oral argument, the Court ruled that the conscious avoidance instruction would be given.[3]  (6/23/16 Tr. at 570-572.)

---

[2] The limiting instruction was as follows:

"The defendant is charged with the crime of money laundering related to the transactions involving Max Larsen. The government has offered evidence which it claims shows that the defendant had a prior relationship with Frank Speight, and that the defendant engaged in similar conduct with Frank Speight other than that charged in the Indictment.  In that connection, I instruct you that the defendant is not on trial for committing similar acts not alleged in the Indictment.  Accordingly, you may not consider evidence of similar acts or the prior relationship between the defendant and Frank Speight as a substitute for proof that the defendant committed the crime charged. Nor may you consider this evidence as proof that the defendant has a criminal personality or bad character.  The evidence of other similar acts was admitted for a much more limited purpose.  That is, if you determine that the defendant committed the acts charged in the Indictment and other similar acts as well, then you may, but you need not, draw an inference that the defendant acted knowingly and intentionally and not because of some mistake, accident or other innocent reason in committing the acts charged in the Indictment.  Evidence of similar acts may be considered by you only for this limited purpose, and not for any other purpose.  Specifically, you may not use this evidence to conclude that because the defendant committed other similar acts, he must also have committed the act charged in the Indictment."

[3] The conscious avoidance instruction was as follows:

"In determining whether the defendant believed that the property was the proceeds of fraud in the sale of securities, you may consider whether the defendant deliberately closed his eyes to what would otherwise have been obvious to him.  Guilty knowledge may not be established by demonstrating that the defendant was merely negligent, foolish or mistaken.  However, if you find beyond a reasonable doubt that the defendant acted with a conscious purpose to avoid learning about the source of the proceeds involved in the charged transactions, then this element may be satisfied.  If you find beyond a reasonable doubt that the defendant was aware of a high probability that the charged transactions involved the proceeds of fraud in the sale of securities, and that the defendant acted with deliberate disregard of the facts, you may find that the defendant acted with the belief necessary to satisfy this element. However, if you find that the defendant actually believed that the proceeds involved in the charged transactions were not the proceeds of fraud in the sale of securities, he may not be convicted.  It is entirely up to you whether you find that the defendant deliberately closed his eyes and any inferences to be drawn from the evidence on this issue."

## II.     Evidence at Trial

A jury trial commenced on June 20, 2016.  The government's evidence at trial included the testimony of five witnesses.  Flom's evidence at trial included the testimony of two character witnesses.  The evidence established the following facts, which are relevant to the instant motion:

### A.  Testimony of Max Larsen and the Consensual Recordings

The government's key witness at trial was FBI Special Agent Max Larsen, the undercover agent who Flom believed was selling fraudulent securities and for whom Flom agreed to launder money.  During his testimony, Larsen walked the jurors through a number of errors on an Adfitech stock certificate that one of the Speight Scheme victims, Janell Beck, had received.  (GX 501–508.)  Larsen testified that it was a "fake certificate."  (6/21/16 Tr. at 194:24–25.)  He explained that (1) the certificate incorrectly listed Florida – as opposed to Delaware – as the state of incorporation; (2) the certificate was not signed by the actual CEO of Adfitech, but rather by a bartender who worked for IST; (3) the certificate listed IST as the transfer agent for Adfitech, even though IST was not the registered transfer agent; and (4) the certificate listed 1,500 shares in one place and 3,000 shares in another place.  (*Id.* at 194:20–196:1.)  Larsen testified that the numerical discrepancy in shares alone rendered the certificates invalid.  (*Id.*)  Larsen also testified that Altmark, another of the fraudulent securities sold as part of the Speight Scheme, was a bond that had never made a coupon payment, which rendered the security essentially worthless.  (*See id.* at 140:13–141:7, 242:8–24.)

Moreover, during Larsen's testimony, the government admitted, without objection, an exhibit containing excerpts from various calls and in-person meetings with Flom.  (*See* Government's Exhibit ("GX") 100.)  These consensual recordings were played for the jurors and

Larsen testified afterwards about certain portions of the recordings. Key excerpts of the recordings and corresponding testimony were as follows:

### i. September 19, 2013: Call Between Flom and Speight

Larsen first gave a brief overview of the government's investigation into Frank Speight and its discovery that Speight had been "selling fake stock certificates that were actually being printed out on a laser printer." (*See* 6/21/16 Tr. at 142:11–21.) Larsen then explained that Speight agreed to introduce him to some of his associates, including Flom. (*See id.* at 143:21–144:16.) On September 19, 2013, Speight recorded a phone conversation with Flom where he informed him that he was setting up a meeting with "a guy that's gotta group" who does the "same thing" as was done in the Speight Scheme, *i.e.*, had the "same, you know set up where the money has to come through you and you get a fee." (*See* GX 100-A-T at 1:21–2:6.) Moreover, Speight informed Flom that he advocated for a 5% fee for Flom's participation. (*See id.*)

### ii. September 26, 2013: In-Person Meeting with Flom, Larsen, and Speight

On September 26, 2013, Flom met in person with Larsen and Speight. Speight informed Flom that Larsen wanted to "replicate" the structure of the Speight Scheme. (*See* GX 101-B-T at 12:16–24.) Larsen testified at trial that prior to the meeting, Speight had been directed by the FBI to portray the UC Scheme as "the same scheme" that Speight and Flom had been involved in previously, just with Larsen stepping in as the person selling the fake certificates. (*See* 6/21/16 Tr. at 163:2–17.) At the meeting, Larsen tells Flom about an inexperienced attorney he had previously worked with where the bank raised "red flags," (GX 101-B-T at 10:5–34), and asked Flom what he would do to make sure "red flags aren't . . . getting raised." (*See* GX 101-E-T at 1:18–30.)

At the meeting, Flom repeatedly made comments indicating that he was willing to participate in the UC Scheme, even though Larsen was committing fraud. For example, after

discussing the paperwork that would accompany the transactions, Flom stated, "whatever you do in your shop is for you." (GX 101-E-T at 4:6–21.) Similarly, after comparing the certificates that customers would buy from Larsen to a jug of milk, Flom stated, "You wanna go into a store and buy a jug of milk, go and buy a jug of milk. . . . I don't have to sit there and go oh well wait a second . . . how long's it been sitting in your bank before you send it out. I could give a rat's ass." (*See* GX 101-G-T at 3:6–40.) Flom then requested a quarter "retainer" from Larsen and stated that he, Larsen, and Speight enjoyed a "protected triangle" but that "I don't have ta [sic] you know everything that you do I DO NOT capital letters DO NOT have to know . . . everything that you do, when you do it, why you do it right just what we were talkin' about with the milk sitting on the shelf in the store." (GX 101-G-T at 8:22–34.) Larsen responded to Flom, "[A]t the end of the day . . . you don't give a shit what we're sellin' on the other side" and apologized for being "crass," to which Flom replied, "It's not crass . . . it's being blunt and direct. . . . I'm not one of these people . . . [w]ho cares what you do . . . You do what you do." (GX 101-L-T at 1:24–2:22.)

At the very end of the meeting, Flom told Larsen that "we're here to make money . . . and to protect our wingman" before going on to quote "The Charge of the Light Brigade," saying that he is willing to "go to war." (*See id.* at 4:22–7:38.) Flom then comments that the letters of his name, F-L-O-M, stand for "For Love of Money." (*Id.* at 8:6–7.) At no point during or after this meeting did Flom question the arrangement that had been proposed, say he was uncomfortable, or express any reservations about working with Larsen. (*See* 6/21/16 Tr. at 193:5–11.)

### iii. December 6, 2013: Call Between Flom and Larsen

Larsen testified that after the September 2013 meeting, the FBI experienced funding issues that prevented them from beginning to start sending payments from purported investor-victims to Flom. (*See* 6/21/16 Tr. at 196:5–18.) On December 6, 2013, Larsen called to make

excuses as to why he had not yet started doing business with Flom. (*See id.* at 197:2–10.) Larsen expressed that he was still interested in doing business with Flom and clarified that he would be selling certificates for Adfitech stock. (*See id.*) On the call, Larsen expressed surprise that some of the purported investor-victims were "actually calling [him] back" and asking for more securities. (*See* GX 102-B-T at 1:1–12.) He then said, "Yeah let me, let me warm up the laser printer and we'll get you some more of those" even though, according to Larsen's testimony, a broker dealer may never print securities. (*See id.*) Flom never expressed any concern about Larsen's comment that he could print additional certificates off his laser printer. (*See* 6/21/16 Tr. at 202:5–8.) Larsen also told Flom not to "pick up the phone if I'm gonna try to sell you some of these certificates" and to tell him to "pound sand," to which Flom laughed. (GX 104-E-T at 1:5–7.) Flom never asked Larsen why he should not want to buy the certificates and never tried to buy any for himself or his family members. (*See* 6/21/16 Tr. at 204:10–205:4.)

At no point after this call did Flom express any concern about working with Larsen, and after this call Flom sent Larsen his bank account information, which he understood would be relayed to purported investors. (*See id.* at 205:5–12.)

### iv. December 17, 2013: Call Between Flom and Larsen

Larsen called Flom on December 17, 2013, and Flom confirmed that the memo line for the first payment should include the name of the stock that was being purchased, which he mispronounced as "Alafitic" instead of "Adfitech." (*See* GX 103-A-T at 2:23–46.) After this call, the FBI began sending checks form purported investors to Flom. (6/21/16 Tr. at 216:18–20.) Larsen testified that the FBI's first check to Flom included the memo line "ML Capital/Adfitech," per Flom's instruction. (*See id.* at 223:2–6; GX 401-A.)

### v. February 15, 2014: In-Person Meeting with Flom, Larsen, and Speight

Flom, Larsen, Speight met in person on February 15, 2013. At the beginning of the meeting, Speight explained to Flom that one of the reasons it had taken some time for the UC Scheme to begin was because they did not want to use the certificates that had been used in the Speight Scheme, in case someone recognized the certificates and had "a bad experience before." (GX 104-D-T at 2:12–33.) Speight also said that the customers did not like the first set of new certificates, so he had to "spend the money and get . . . nicely cut ones." (*See id.* at 2:37–40.)

Throughout the meeting, Larsen presented various "role plays" or "scenarios" to Flom, during which he asked Flom what he would say if a disgruntled customer called complaining. During the role plays, Larsen repeatedly used phrases such as "completely bogus certificates" and "bullshit certificates." (*See, e.g.*, GX 104-E-T at 3:34–36, 5:24–36.) Larsen also presented a scenario where a customer says "I tried to deposit this at Fidelity and Fidelity told me this is a completely fictitious security. This is printed off some transfer agent's printer in Florida." (GX 104-H-T at 3:17–20.) Furthermore, Larsen asked Flom what he would do if the SEC called. (*Id.* at 9:7–8.) When presented with these scenarios, Flom told Larsen that he would not give the caller any information and would circle back with Speight and Larsen to get their stories straight. (*See, e.g.*, 104-E-T at 4:33 ("All I would do is take notes and phone you.").) At trial, Larsen testified that he presented these scenarios to Flom to see what his reaction would be and to give him an opportunity to walk away. (*See* 6/21/16 Tr. at 236:13–237:4.) However, Flom never asked Larsen why he was presenting him with these scenarios and never expressed hesitation about continuing to be involved in the UC Scheme. (*See id.* at 237:5–10.)

During the meeting, Larsen also told Flom that he would be giving him a 5% cut in the UC Scheme, even though others in the past had made 2–3%, to ensure Flom's discretion and because he was "taking a risk." (GX 104-E-T at 11:1–6.) Towards the end of the meeting, Larsen also asked Flom if he had "scared [Flom] away," to which Flom responded no. (*See* GX

104-I-T at 18–20.)  Larsen testified that he asked this because throughout the meeting he had been "incredibly blunt . . . had talked about fictitious certificates, bogus certificates, problems that are going to happen to investors" and was giving Flom one final opportunity to walk away. (*See* 6/21/16 Tr. at 252:7–19.)  Flom never questioned why Larsen was asking if he had been scared away.  (*Id.* at 252:20–21.)

At the end of the meeting, the music on the recording can be heard getting louder, and Larsen complained about the volume.  In response, Flom told him that this was a good thing because now if anyone ever asks what was discussed at the meeting, they can say they "couldn't hear a damn thing."  (GX 104-I-T at 3:2–9.)  They proceed to have an exchange (the "Worth Avenue Exchange") where Larsen said, "So wait . . . didn't that guy Max tell you he was selling completely worthless securities?" and Flom responded, "No I heard Worth Avenue."  (*See id.* at 3:21–4:3.)  Larsen then said, "No but he told you Frank was printing stuff out on a laser printer, and selling them to investors," and Flom responded, "Yeah your boarding pass 'cause you were late for your flight."  (*See id.*)

After the meeting, Flom did not contact Larsen expressing any concern about what Larsen had said.  (*See* 6/21/16 258:15–20.)  A few days later, the FBI began sending Flom much larger checks from purported investors, and Flom took his 5% cut and sent the remainder to Larsen.  (*See id.* at 257:14–258:6.)

**B.  Testimony of Robert Thibault**

The government called Robert Thibault, a former investigator for RBC Bank in Montreal, Canada, whose job had been to investigate suspected fraud and money laundering.  (*See* 6/20/16 Tr. at 45:3–7.)  Thibault testified that in March 2012, he was assigned to investigate a personal bank account belonging to Flom, which Flom held jointly with his mother.  (*See id.* at 49:17–21.) According to Thibault, prior to February 24, 2012, Flom's RBC Bank account had gone unused

for more than a year and had a balance of about $82 Canadian. (*See id.* at 55:6–16; GX 700.) However, starting February 24 and continuing for the next twenty-eight days, a series of transfers took place into and out of Flom's account, resulting in almost $96,000 Canadian flowing through the account, and leaving a balance of about $1,600 Canadian. (*See* 6/20/16 Tr. at 45:3–7; GX 700.)

Thibault testified that he met with Flom on April 9, 2012, and told Flom that his "conclusion" was that Flom's "account was used for the illegal sale of bogus securities" and "that given those suspicions . . . RBC would be undertaking to close the relationship between RBC and Mr. Flom" and would be "closing the account through which the funds were being channeled." (*See* 6/20/16 Tr. at 69:1–9.) Records admitted later at trial showed that, just nine days after his meeting with Thibault, Flom opened the TD Bank account that he would use to continue the Speight Scheme and participate in the UC Scheme. (GX 400.)

### C. Testimony of Janell Beck

Janell Beck, a victim of the Speight Scheme, testified that in early 2013, she received a call from a woman who offered to sell her Adfitech stock. (*See* 6/20/16 Tr. at 97:22–98:21.) Throughout the following five months, Beck made eleven separate purchases of Adfitech stock, totaling approximately $65,000. (*See id.* at 99:15–24.) Per the instructions of the woman who called her, Beck wired these payments to a TD Bank account in Florida entitled "Jonathan Flom Special Account." (*See id.* at 99:25–101:20.) Beck walked the jury through several facial errors with her purchased certificates, including (1) a discrepancy on one certificate between the numbers of shares, which were listed differently in two separate places; (2) a mistake in her name on another certificate; and (3) a printing error on a third certificate. (*See id.* at 105:8–107:23; GX 504; GX 507.)

### D. Testimony of Adam Karczewski

FBI Special Agent Adam Karczewski testified about the FBI's approach of Flom in 2014 and the voluntary statements Flom made to the FBI. At the time of the FBI's approach, Flom did not yet know that Larsen was an undercover agent, a fact that was not disclosed to him by the interviewing agents. (*See* 6/22/16 Tr. at 450:2–451:1.) Karczewski testified about three key statements made by Flom: (1) Flom said he "winced" when Larsen referred to "bogus securities" at their February 2014 meeting; (2) Flom said that he knew Speight and Larsen were selling "fraudulent, bogus securities, but that he thought his deals only related to Altmark"; and (3) that Flom recalled a conversation with Speight where Speight said he was "printing new certificates" that "look real." (*See id.* at 451:2–452:25.)

During Karczewski's testimony, the government also admitted recordings of two phone conversations between Speight and Flom regarding opinion letters that Speight wanted Flom to sign. The first recording, on November 19, 2013, consisted of Speight discussing Altmark securities and saying he needed "a letter from [IST] . . . sayin' [that] we're aware that in the past coupon payments have been made, which is not true." (GX 155-A-T at 2:12–32.) Despite Speight saying it was "not true" that coupon payments had been made, and Larsen's earlier testimony that Altmark indeed had never paid a coupon, Flom signed a letter dated the same day as the call saying, "IST can confirm that Coupon payments for the Altmark Bonds series listed above have been paid historically." (*See* GX 304.) The second recording, on November 21, 2013, consisted of Speight asking Flom to include an additional line in the letter that was "actually accurate." (*See* GX 157-A-T at 1:3–15.) That same day, Flom signed a backdated letter that included the newly requested information, but still said that Altmark had historically made coupon payments. (*See* GX 305.) These calls took place following Flom's first meeting with Larsen, after Flom had already agreed to participate in the UC Scheme.

### E. Testimony of Carol White

The government's final witness was Carol White, a Financial Analysist with the FBI. White presented a summary exhibit showing that from October 2012 through August 2013, Flom had used his personal checking account at TD Bank to channel $658,764 in investor funds, transferring $638,757 to Speight and keeping $20,007 for himself. (*See* GX 407.) White presented another summary exhibit showing that from December 2013 through April 2014, Flom used that same account to channel the $141,300 sent to him by the FBI from purported investors into what he believed was Larsen's bank account in Queens, New York. (*See* GX 410.) In doing so, Flom transferred $134,234 to Larsen and kept $7,065 for himself. (*See id.*) White also testified that there was no reason why money could not have been sent directly from investors in the UC Scheme to the bank account purportedly controlled by Larsen. (*See* 6/23/16 Tr. at 588:18–589:1.)

### F. The Defense Case

After the close of the government's case, the defense called two character witnesses, Tara Eden Pearl, a licensed real estate broker, and John Mariani, an attorney. (*See generally* 6/23/16 Tr.) Each testified to Flom's character and reputation for honesty and integrity. (*See* 6/23/16 Tr. at 625:6–633:18; 671:16–677:15.)

### III.  The Verdict and Post-Trial Motions

After deliberating for approximately one hour and forty-five minutes, the jury returned a verdict finding Flom guilty of money laundering. (*See* 6/24/16 Tr. at 856:15–18.) Flom filed the instant post-trial motions. (*See generally* Post-Trial Mot.) Flom had previously moved for a judgment of acquittal at the close of the government's case-in-chief, which the Court denied, noting that "taking the evidence in the light most favorable to the Government . . . there [was]

more than enough for a jury to decide . . . the critical issue of knowledge." (*See* 6/23/16 Tr. at 604:5–21.)

## STANDARD OF REVIEW

### I.     Rule 29

Rule 29 provides that, on a defendant's motion, the Court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).  "A defendant who challenges the sufficiency of the evidence supporting his conviction 'bears a heavy burden.'"  *United States v. Velasquez*, 271 F.3d 364, 370 (2d Cir. 2001) (quoting *United States v. Finley*, 245 F.3d 199, 202 (2d Cir. 2001)).  "Not only must the evidence be viewed in the light most favorable to the Government and all permissible inferences drawn in the Government's favor, but the jury verdict must be upheld if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (internal citation omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) ("[T]he court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." (internal quotation marks omitted)).  In determining a Rule 29 motion for judgment of acquittal, the Court must "view pieces of evidence 'not in isolation but in conjunction.'"  *United States v. Torres*, 604 F.3d 58, 67 (2d Cir. 2010) (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 978 (2d Cir. 1990)).

In resolving a Rule 29 motion, a court should "avoid usurping the role of the jury." *Guadagna*, 183 F.3d at 129.  A court must "defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony."  *United States v. Bala*, 236 F.3d 87, 93–94 (2d Cir. 2000).  Moreover, a court cannot "substitute its own determination of . . . the weight of

the evidence and the reasonable inferences to be drawn for that of the jury." *Guadagna*, 183

F.3d at 129 (internal quotation marks omitted). Therefore, the jury's verdict will be upheld even

when it is based entirely on circumstantial evidence. *Jackson*, 335 F.3d at 180. "In fact, if the

court concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly

possible, [the court] must let the jury decide the matter." *Guadagna*, 183 F.3d at 129 (internal

quotation marks omitted).

## II.     Rule 33

Rule 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment

and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. Generally, the

Second Circuit disfavors Rule 33 motions for a new trial. *United States v. Figueroa*, 421 F.

App'x 23, 24 (2d Cir. 2011) (citing *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995).

While courts generally have broader discretion to grant a new trial under Rule 33 than to grant a

motion for acquittal under Rule 29, "courts must nonetheless exercise Rule 33 authority

'sparingly' and in 'the most extraordinary of circumstances.'" *United States v. Sanchez*, 969

F.2d 1409, 1414 (2d Cir. 1992); *see also United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir.

2001).

The defendant bears the heavy burden of demonstrating that a new trial is warranted. *See*

*United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009). A motion for a new trial under

Rule 33 "'should not be granted unless the trial court is convinced that the jury has reached a

seriously erroneous result or that the verdict is a miscarriage of justice.'" *Smith v. Carpenter*,

316 F.3d 178, 183 (2d Cir. 2003) (quoting *Atkins v. New York City*, 143 F.3d 100, 102 (2d Cir.

1998)). Unlike the standard under Rule 29, the court is entitled under Rule 33 to "weigh the

evidence and in so doing evaluate for itself the credibility of the witnesses." *Sanchez*, 969 F.2d

at 1413 (internal quotation marks and citation omitted). However, because "courts generally

must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *Ferguson*, 246 F.3d at 133 ("An example of exceptional circumstances is where testimony is 'patently incredible or defies physical realities,' although the district court's rejection of trial testimony by itself does not automatically permit Rule 33 relief." (quoting *Sanchez*, 969 F.2d at 1414)). Accordingly, the court "must strike a balance between weighing the evidence and credibility of witnesses and not 'wholly usurping' the role of the jury." *Ferguson*, 246 F.3d at 133 (internal citation omitted).

The crucial question on a Rule 33 motion is whether it would be a "manifest injustice" to let the guilty verdict stand. *Id.* at 134. A "manifest injustice" occurs where a trial court cannot be satisfied that "competent, satisfactory, and sufficient evidence" supports the jury's finding of guilt beyond a reasonable doubt. *Id.* (citing *Sanchez*, 969 F.2d at 1414). For a trial court to grant a Rule 33 motion, the court "must harbor a real concern that an innocent person may have been convicted." *United States v. Guang*, 511 F.3d 110, 119 (2d Cir. 2007).

## DISCUSSION

### I.     Sufficiency of the Evidence

Flom challenges the sufficiency of the evidence with regard to his conviction of money laundering. In order to prove the crime of money laundering, the government must establish beyond a reasonable doubt that: (1) the defendant conducted an interstate transaction affecting interstate commerce; (2) the transaction involved money represented by a law enforcement officer and believed by the defendant to be the proceeds of fraud; and (3) the defendant intended to promote the carrying on of fraud. *See* 18 U.S.C. 1956(a)(3)(A). At trial, Flom conceded that the government met the first element. (*See* 6/24/16 Tr. at 797:13–17.) In his motion for a judgment of acquittal, Flom argues that the government failed to prove beyond a reasonable

doubt that he "had the deliberate, knowing and specific intent to commit the offense charged in the indictment." (Post-Trial Mot. at 4.) The Court finds Flom's argument meritless.

Viewed in the light most favorable to the government and with all permissible inferences drawn in the government's favor, the evidence at trial demonstrates that Flom believed the funds he was receiving from the purported investors were the proceeds of securities fraud, and that he intended to promote that fraud. In other words, the evidence put forward by the government, when viewed as a whole, was sufficient for a reasonable trier of fact to find beyond a reasonable doubt that Flom had the knowledge and intent to commit the money laundering charge. First, the government presented evidence that after Flom had been put on notice by RBC Bank that his pattern of moving money through his account for Speight was consistent with the illegal sale of bogus securities, Flom decided to immediately open a new bank account and continue the same pattern of funneling money – first for Speight, and then for Larsen. (*See* 6/20/16 Tr. at 69:1–9; GX 400; GX 407; GX 410.) Next, the government presented recordings between Larsen and Flom in which (1) Larsen expresses concerns about raising "red flags" with banks, (GX 101-B-T at 10:5–34; GX 101-E-T at 1:18–30); (2) Larsen describes the securities at issue as "bullshit," "bogus," "completely fictitious," and "a lot less than real," (*see, e.g.*, GX 104-E-T at 3:34–36, 5:24–36); and (3) Larsen tells Flom that he is being paid 5% of proceeds – as opposed to the typical 2–3% – because he was "taking a risk," (GX 104-E-T at 11:1–6.) The government also introduced testimony from Larsen that after he made comments to Flom about fictitious certificates, Flom failed to inquire further or walk away. (*See, e.g.*, 6/21/16 Tr. at 252:7–21.)

Moreover, the government introduced several statements that Flom made to Larsen and Speight, which are inconsistent with statements concerning a legitimate business transaction. In those statements, Flom insists: (1) that they be ready to go "to war" if there's an issue; (2) that they be in a protected triangle; and (3) that they get their stories straight. (*See, e.g.*, GX 101-L-T

18

at 4:22–8:7.)  The government also introduced bank records that suggested Flom's willingness to accept increasing amounts of purported investor-victim funds even after Larsen had become more explicit about the fraudulent nature of his business.  (*See, e.g.*, GX 400, 407, 410.)  In addition, the government presented Flom's admission to the FBI that he knew Speight and Larsen were selling "fraudulent securities," but that he believed all of his transactions involved only Altmark.  (*See* 6/22/16 Tr. at 452:13–15.)  In that respect, the government also produced evidence that: (1) Flom believed the UC Scheme involved the same certificates as the Speight Scheme – i.e., Adfitech and Altmark, (*see, e.g.*, GX 103-A-T at 2:23–46; GX 401-A); and (2) Flom knew there was fraud related to Altmark, given his signing of the false opinion letters claiming that Altmark had made coupon statements in the past, (GX 155-A-T at 2:12–15, 2:31–32; GX 157-A-T at 1:11–15; GX 304; GX 305.).  Furthermore, the government presented Flom's admissions to the FBI that he winced when Larsen mentioned "bogus" securities to him at their February 15, 2014 meeting – suggesting that "wincing" is indicative of knowledge that something is wrong.  (*See* 6/22/16 Tr. at 451:4–452:3.)

Taken together, the government's evidence and witness testimony are sufficient to prove Flom's knowledge and intent, especially when viewed in the light most favorable to the government pursuant to Rule 29.  Accordingly, in light of the substantial evidence put forward by the government, Flom's vague claim that the government did not prove his knowledge or intent beyond a reasonable doubt cannot satisfy his "heavy burden" of demonstrating that "no rational reasonable jury could find guilt beyond a reasonable doubt."  *See Guadagna*, 183 F.3d at 130.

## II.     Claims of Error in Support of New Trial

Flom further argues that the court erroneously: (1) allowed the government to present evidence of the Speight Scheme pursuant to Rule 404(b); (2) instructed the jury on conscious

avoidance; (2) denied his pretrial motion for a change of venue; and (3) refused to direct the government to produce discovery of FBI reports of interviews with Frank Speight. Each of these claims fail.

### A. Evidence of the Speight Scheme

Flom argues that he is entitled to a new trial because the government's presentation of evidence of the Speight Scheme pursuant to Rule 404(b) was unfairly prejudicial. Courts in the Second Circuit take an "inclusionary approach" to Rule 404(b), admitting evidence of prior crimes, wrongs, or acts "unless it is introduced for the sole purpose of showing the defendant's bad character . . . or unless it is overly prejudicial under Fed. R. Evid. 403 or not relevant under Fed. R. Evid. 402." *United States v. Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996); *see also United States v. Edwards*, 342 F.3d 168, 176 (2d Cir. 2003). Under this approach, such evidence must be (1) offered for a proper purpose, (2) relevant, and (3) substantially more probative than prejudicial. *United States v. Moran-Tala*, 726 F.3d 334, 345 (2d Cir. 2013). If the evidence is admitted, the district court should provide the jury with an appropriate limiting instruction concerning the evidence, if the defendant so requests. *United States v. Downing*, 297 F.3d 52, 58 (2d Cir. 2002). Here, evidence of the Speight Scheme introduced at trial was probative and relevant to how Flom came to meet and trust Larsen and to Flom's knowledge of the fraudulent nature of the scheme at issue in this case – the UC Scheme.

At trial, the government presented evidence of the Speight Scheme to demonstrate that the money laundering scheme charged in this case was modeled on the Speight Scheme, came about through Speight's introduction of Flom to Larsen, involved the same certificates as the Speight Scheme, and involved Flom playing the same role and using the same account as he did in the Speight Scheme – albeit receiving a greater fee for his efforts. (*See* 6/21/16 Tr. at 141:8–144:22); *see also United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996) ("One legitimate

purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case . . . [and] may also be used to help the jury understand the basis for the co-conspirator's relationship of mutual trust."). Recordings at trial demonstrated that when Speight first introduced Larsen to Flom, he informed him that he was setting up a meeting with someone doing the "same thing" as they had done in the Speight Scheme. (GX 100-A-T at 2:1–6.) Flom was told that Larsen wanted to "replicate" the structure of the Speight Scheme, (GX 101-B-T at 12:16–24), and use the same certificates as the ones used in the Speight Scheme, (*see, e.g.*, GX 103-A-T at 2:23–46; GX 401-A).

As an initial matter, Flom makes no claim that any of the evidence of the Speight Scheme presented at trial was outside the scope of the Court's pretrial 404(b) ruling. Rather, in his motion for a new trial, Flom claims that the government was remiss in using its opening statement to inform the jurors that it would be calling Richard Thibault and Janell Beck, two witnesses who the Court specifically ruled could testify, without identifying their testimony as falling under Rule 404(b) or requesting a limiting instruction. (*See* Post-Trial Mot. at 7–8.) This argument fails. Opening statements introduce the jury to the evidence – including witnesses – that a party intends to present. Jurors are instructed that opening statements are not evidence, and the opening statements may not include attorney argument. The government's opening statement – which did not draw any objection from Flom during trial – briefly set out the upcoming evidence and witness testimony without including attorney arguments or law concerning that testimony that would unfairly prejudice Flom. Moreover, the opening statement was within the scope of the Court's pretrial rulings concerning Rule 404(b) evidence. (*See* 6/20/16 Tr. at 30–31.) Finally, Flom's argument that the government should have included a limiting instruction in its opening argument is not grounded in any legal basis.

Flom also claims that the government put an "inordinate" emphasis on 404(b) evidence during its closing argument and made it a central feature of the government's case against him. (*See* Post-Trial Mot. at 8.)  As an initial matter, Flom's counsel made no objections during the government's summation of the trial evidence at closing argument.  For that matter, Flom does not claim that the government suggested in its closing argument that the 404(b) evidence was admissible to demonstrate Flom's propensity to commit bad acts.  Rather, in its closing argument, the government stated that the Speight Scheme evidence provided "a basis for the defendant's knowledge before he met [Larsen]," which was exactly the purpose cited by the Court for its admissibility.  (*See* 6/23/16 Tr. at 735.)  Flom also provides no legal basis to support his implication that there is an outer limit as to how much the government may rely on properly admitted 404(b) evidence.  In any case, the majority of the government's summation focused on the UC Scheme, not the Speight Scheme.  (*See, e.g.*, 6/23/16 Tr. at 739–764.)  Specifically, the government's summation focused on: (1) Larsen's increasing directness in describing the fraudulent nature of the UC Scheme; (2) bank records demonstrating Flom's corresponding willingness to accept increasing amounts of money from purported investor-victims; (3) Flom's statements suggesting it was good that the music volume had increased  in order to initiate the "Worth Avenue Exchange"; and (4) Flom's failure to ask any questions about why Larsen was posing the role plays about bogus securities because "he already knew the answer."  (*See, e.g.*, *id.*)  Thus, the government's closing did not inordinately feature evidence of the Speight Scheme, but instead, focused on direct evidence proving Flom's guilt of the charged scheme.

Furthermore, Flom claims that the impact of Thibault's testimony was to establish that Flom had a propensity to engage in later illegal conduct.  To the contrary, the government presented Thibault's testimony as evidence that Flom was put on notice that his personal bank account was being used as a conduit for funds derived from the illegal sale of securities.  (*See*

6/16/16 Tr. at 17:11–24:4, 26:11–36:4); *see also United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993) (finding that evidence that the defendant had previously engaged in narcotics trafficking with a co-conspirator is highly probative of the defendant's intent to enter another drug conspiracy with the same co-conspirator, and to rebut the defendant's defense of innocent association).  Thibault testified that, after investigating an RBC personal bank account belonging to Flom, he met with Flom to inform him that his "account was used for the illegal sale of bogus securities," and that given those suspicions, RBC would be "closing the account through which the funds were being channeled." (*See* 6/20/16 Tr. at 69:1–9.)  Records admitted later at trial showed that, just nine days after his meeting with Thibault, Flom opened the TD Bank account that he would use to continue the Speight Scheme and participate in the UC Scheme.  (GX 400.)  Accordingly, Thibault's testimony was both direct evidence that Flom was put on notice that his personal bank account was being used for the illegal sale of bogus securities and probative of Flom's knowledge, intent, and the absence of any mistake or accident in using the same account in the charged UC Scheme.

    At trial, the probative value of the evidence was not outweighed by the danger of unfair prejudice.  The evidence of the Speight Scheme and Thibault's testimony were no "more sensational or disturbing than the crime[] with which [the defendant] was charged." *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990).  Moreover, any prejudice was mitigated by the limiting instruction to the jury – modeled largely after the one requested by Flom's counsel – concerning the proper purpose for which the jury may use this evidence in deliberations.  *See United States v. Abu-Jihaad*, 630 F.3d 102, 133 (2d Cir. 2010) ("Absent evidence to the contrary, we must presume that juries understand and abide by a district court's limiting instructions.").  Flom's arguments that the timing of the limiting instruction was unfairly

prejudicial is similarly unavailing.  The limiting instruction was given at the close of

Karczewski's testimony – per Flom's request – and also was repeated as part of the jury charge.

For the reasons set forth above, the evidence and testimony related to the Speight Scheme

was relevant and probative in demonstrating how the UC Scheme developed and that Flom had

the knowledge and intent necessary to commit the charged offense.  Flom's contention that the

probative value of the evidence at trial was substantially outweighed by unfair prejudice is

unavailing.

### B.  Conscious Avoidance

Flom next argues that he is entitled to a new trial because the Court erroneously

instructed the jury on conscious avoidance.  Flom reiterates the arguments he made at trial,

emphasizing that the government failed to demonstrate that Flom took affirmative steps to avoid

learning of the fraudulent nature of the UC Scheme.  (*See* Def.'s Opp'n Conscious Avoidance

(Doc. No. 65); 6/23/16 Tr. at 557–66.)  Flom's argument is unavailing.

As discussed at trial, a conscious avoidance charge is appropriate where: (1) the

defendant asserts the lack of knowledge required for conviction, as Flom undisputedly does here;

and (2) there is a sufficient factual predicate for the charge.  *United States v. Nektalov*, 461 F.3d

309, 315–16 (2d Cir. 2006).  To prove that a sufficient factual predicate exists, the government

must provide enough evidence for a rational juror to conclude beyond a reasonable doubt that:

(1) Flom was aware of a high probability that the securities involved in the UC Scheme were

fraudulent (the "probability requirement"); and (2) Flom consciously avoided confirming that

fact (the "conscious avoidance requirement").  *See id.* at 316; *see also United States v. Kozeny*,

667 F.3d 122, 132 (2d Cir. 2011); *United States v. Aina-Marshall*, 336 F.3d 167, 170 (2d Cir.

2003).

With respect to the probability requirement, the government set forth several statements from Larsen to Flom that demonstrate a high likelihood that Larsen was engaging in the sale of fraudulent securities. *See United States v. Ferguson*, 676 F.3d 260, 278 (2d Cir. 2011) ("Red flags about the legitimacy of a transaction can be used to show both actual knowledge and conscious avoidance."). Larsen and Flom's conversations were indicative of people who were, as alleged, orchestrating a fraudulent scheme. First, at the September 26, 2013 meeting, Larsen informed Flom that he wanted to make sure Flom's actions would not cause "red flags," like the actions in his previous scheme with an attorney. (GX 101-E-T at 1:28–30.) Likewise, after expressing surprise that purported customers were "actually calling [him] back" and asking for more securities, Larsen told Flom, "Yeah let me, let me warm up the laser printer and we'll get you some more of those" even though, according to Larsen, a broker dealer may never print securities. (GX 102-B-T at 1:1–12.) Afterwards, Larsen "role plays" with Flom, acting as a disgruntled customer calling to complain about purchasing "completely bogus certificates" and "bullshit certificates." (GX 104-E-T 3:34–36, 5:24–36.) Larsen then informs Flom that he will receive 5% of the funds flowing through his account – unlike the typical 2% or 3% – to ensure Flom's "discretion" and to compensate Flom for "taking a risk." (*Id.* at 11:1–6.) Thus, notwithstanding the Rule 404(b) evidence of the Speight Scheme, the government provided evidence of red flags about the legitimacy of the UC Scheme, which was sufficient for a rational jury to conclude beyond a reasonable doubt that Flom was aware of a high probability that his transactions with Larsen involved proceeds from fraudulent securities. *See Ferguson*, 676 F.3d at 278 (finding an appropriate factual predicate where there was evidence of "red flags," including, *inter alia*, insisting on strict confidentiality); *see also United States v. Pierre*, 285 F. App'x 828, 830 (2d Cir. 2008) (finding an appropriate factual predicate where defendant received complaints from company clients about the company's possibly fraudulent activity).

With respect to the conscious avoidance requirement, Flom argues that the government must provide evidence that he took affirmative steps to avoid learning that the UC Scheme involved fraudulent securities. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766–68 (2011). However, as both parties noted in their submissions, the Second Circuit has held that evidence of affirmative steps is not strictly necessary. In keeping with the Supreme Court's decision in *Global-Tech* and prior cases from the Circuit, the conscious avoidance requirement "may be established where a defendant's involvement in the criminal offense may have been so overwhelmingly suspicious that the defendant's failure to question the suspicious circumstances establishes the defendant's purposeful contrivance to avoid guilty knowledge." *United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003); *see also United States v. Whitman*, 555 F. App'x 98, 105 (2d Cir. 2014). Simply put, a defendant meets the conscious avoidance requirement if he failed to investigate or deliberately avoided asking any questions that might have confirmed his suspicions. *See Nektalov*, 461 F.3d at 317 (upholding the conscious avoidance instruction because the defendant deliberately avoided asking the undercover agent any questions that might have confirmed his suspicions that the cash used in their transactions constituted the proceeds of illegal activity); *see also Whitman*, 555 F. App'x at 105–06 (upholding the conscious avoidance instruction because the defendant did not question whether his co-conspirator had done something illegal after learning of "red flags," but rather gave her advice "on how better to play fast and loose").

Here, the government presented sufficient evidence at trial that Flom consciously avoided confirming whether Larsen was engaging in securities fraud by turning a blind eye, failing to investigate, and deliberately avoiding asking any questions that might have confirmed his suspicions. First, the government presented Flom's own statements to Larsen, which indicated that Flom would turn a blind eye to any suspicious conduct. For example, after discussing the

26

paperwork that would accompany the transactions in the UC Scheme, Flom told Larsen, "whatever you do in your shop is for you." (GX 101-E-T at 4:6–21.) Moreover, after comparing the certificates that customers would buy from Larsen to a jug of milk, Flom stated, "You wanna go into a store and buy a jug of milk, go and buy a jug of milk. . . . I don't have to sit there and go oh well wait a second . . . how long's it been sitting in your bank before you send it out. I could give a rat's ass." (*See* GX 101-G-T at 3:6–40.) Likewise, after asking for a quarter "retainer," Flom stated that he, Larsen, and Speight enjoyed a "protected triangle" but that "I don't have ta [sic] you know everything that you do I DO NOT capital letters DO NOT have to know . . . everything that you do, when you do it, why you do it right just what we were talkin' about with the milk sitting on the shelf in the store." (GX 101-G-T at 8:15–34.) Similarly, after Larsen told Flom "at the end of the day . . . you don't give a shit what we're sellin' on the other side" and apologize for being "crass," Flom replied "It's not crass . . . it's being blunt and direct. . . . I'm not one of these people . . . [w]ho cares what you do . . . You do what you do." (*Id.* at 1:24–2:22.) Taken together, Flom's statements during his introductory meeting with Larsen indicate his willingness to turn a blind eye to the high probability that Larsen was engaging in securities fraud. Accordingly, Flom's failure to question the suspicious circumstances surrounding the UC Scheme sufficiently demonstrated a factual predicate of conscious avoidance. *See Svoboda*, 347 F.3d at 480.

Even assuming, *arguendo*, that Flom's failure to question the suspicious circumstances is not sufficient to demonstrate conscious avoidance without evidence of affirmative steps, the government did provide evidence of affirmative steps taken by Flom to avoid knowledge of Larsen's overwhelmingly suspicious activity. For example, after Larsen mentioned "red flags" to Flom, he indicated that Flom should be aware of what Larsen was doing. (GX 101-L-T at 10:29–38.) However, Flom interjected and shut down the conversation, saying, "I don't have to

know everything. . . . I don't have to know everything that you're doing either necessarily. I'm just sayin' that . . . ." (*See id.* at 11:4–9.) By doing so, Flom took affirmative steps to stop Larsen from telling him the ultimate fact – that the securities being sold were fraudulent. *Cf. Whitman*, 555 F. App'x at 105–06 (upholding a conscious avoidance instruction because the defendant failed to question or investigate suspicious circumstances, even though he never expressly stated he would rather not know about the co-conspirator's activities).

Accordingly, Flom has failed to demonstrate that his failure to question the suspicious circumstances surrounding the UC Scheme and affirmative steps to stop Larsen from informing him that the securities being sold were fraudulent did not give rise to the purposeful contrivance to avoid guilty knowledge. When presented with all of the indications that Larsen was engaged in securities fraud – at the September 26 meeting, the December 6 call, and the February 15 meeting – Flom, a licensed attorney, never followed up, expressed concern, or asked any substantive questions. Rather, despite the red flags, Flom accepted funds from Larsen's purported investors, deducted his 5% fee, and sent money back to Larsen's company. Flom's contention that there was not an appropriate factual predicate for the conscious avoidance instruction is unavailing.[4]

### C. Pretrial Rulings on Venue and Speight's Statements to the FBI

Flom claims that a new trial is warranted because the Court erroneously (1) denied his pretrial motion for a change of venue under Rule 21(b); and (2) refused to direct the government to produce discovery of FBI reports of interviews with Frank Speight. (*See* Post-Trial Mot. at 5–

---

[4] To the extent that Flom argues the Court should have used the language in his own proposed conscious avoidance instruction, Flom fails to demonstrate how the Court's decision not to do so gives rise to a concern that an "innocent person may have been convicted." *See Guang*, 511 F.3d at 119. The Court's instruction tracked the language of the factual predicate standard and made clear that "[g]uilty knowledge may not be established by demonstrating that the defendant was merely negligent, foolish or mistaken." (*See* 6/24/16 Tr. at 834:22–835:18); *see also Svoboda*, 347 F.3d at 481–82.

6.)  In his motion for a new trial, Flom relies on the same arguments he presented to the Court in his pretrial motions.  Flom fails to provide any new theories, legal support, or factual contentions that would justify the Court's revisiting and overruling its prior decisions.  Nor does Flom demonstrate how the Court's pretrial rulings give rise to a concern that an "innocent person may have been convicted."  *See Guang*, 511 F.3d at 119.  Rather, he appears to merely use Rule 33 as a vehicle to relitigate pretrial rulings with which he disagrees.  Absent a showing that the pretrial rulings greatly prejudiced Flom so as to give rise to a concern that "an innocent person may have been convicted," *see id.*, Flom may not use Rule 33 as a vehicle to relitigate pretrial rulings with which he disagrees.  *See United States v. Castro*, 669 F. Supp. 2d 288, 293 (E.D.N.Y. 2009) (denying Rule 33 motion where defendant sought to relitigate pretrial rulings but did not claim that the jury's verdict resulted in manifest injustice; profess his innocence; offer authority showing that the court's allegedly erroneous ruling would support defendant's request for a new trial; or point to any extraordinary circumstances that would justify a new trial); *see also United States v. Delva*, No. 12-CR-802 (KBF), 2015 WL 629375, at *4 (S.D.N.Y. Feb. 13, 2015) (denying defendant's Rule 33 motion because it was merely an attempt to relitigate evidentiary motions that were briefed and decided before trial); *United States v. Christian*, No. 11-CR-425 (ENV), 2015 WL 3941458, at *15 (E.D.N.Y. June 24, 2015) (same); *United States v. Soto*, No. 12-CR-566 (RPP), 2014 WL 1694880, at *7 (S.D.N.Y. Apr. 28, 2014) ("[A] Rule 33 motion is an inappropriate vehicle to relitigate the trial court's earlier evidentiary decisions.").

Accordingly, Flom fails to meet his burden of demonstrating that the Court's pretrial rulings regarding venue and Speight's statements to the FBI entitle him to a new trial pursuant to Rule 33.  *See Guang*, 511 F.3d at 119.

## CONCLUSION

For the reasons set forth above, defendant Jonathan Flom's post-verdict motions (Doc.

No. 74) are denied.


                                        SO ORDERED.


                                        *Roslynn R. Mauskopf*

Dated: Brooklyn, New York
       June 5, 2017                     _____
                                        ROSLYNN R. MAUSKOPF
                                        United States District Judge