UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
JONATHAN FLOM,

                Petitioner,                 **MEMORANDUM AND ORDER**
                                                                                      19-CV-6476 (RRM)
    - against -                                           14-CR-507 (RRM)

UNITED STATES OF AMERICA,

                Respondent.
---------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, Chief United States District Judge.

      Jonathan Flom, proceeding *pro se*, brings this motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255, principally alleging *Brady* violations and violations of the Confrontation Clause. For the following reasons, the motion is DENIED.

## BACKGROUND

      Flom was indicted by a federal grand jury on September 22, 2014, and charged with one count of money laundering in violation of 18 U.S.C. § 1956(a)(3)(A). (Indictment in 14-CR-507 (Doc. No. 1).) The indictment alleges, among other things, that Flom, a licensed attorney, agreed to participate in a scheme in which he would launder proceeds of the sale of fake stock certificates through his account and then send the money to a bank account that he believed was controlled by the fraudulent stock promoters. (Indictment (Doc. No. 1) at 2.)[1] Unbeknownst to Flom, the scheme was a sting operation ("the 2013–2014 Sting") conducted by the Federal Bureau of Investigation ("FBI"), and Flom had been engaged in the scheme with an undercover agent, who was introduced to Flom by cooperator Frank Speight.

      Flom had previously engaged in financial transactions with Speight in 2012 and 2013, in which Speight had sold fraudulent securities ("the Speight Scheme"). Speight, the former

---
[1] Unless otherwise noted, all page numbers correspond with ECF pagination.

president and sole owner of registered transfer agent International Stock Transfer, Inc. ("IST"), engaged in an offering fraud by soliciting investors, through cold calls and targeted internet advertising, to purchase securities on the promise of high yields. (Motion *in Limine* in 14-CR-507 (Doc. No. 32) at 2.) Speight instructed investors to send their money to "escrow accounts" managed by Flom and another attorney, who did not transfer the money to the issuers of securities, but rather withdrew their own fee and transferred the balance to Speight, who stole the money. (*Id.*) In the summer of 2013, the Securities and Exchange Commission ("SEC") began investigating IST, and IST voluntarily terminated its status as a licensed transfer agent. (*Id.*) Pursuant to an agreement to cooperate with law enforcement, Speight agreed, among other things, to introduce the undercover agent to Flom. (*Id.* at 2–3.)

On September 23, 2014, the SEC filed a civil enforcement suit against Flom related to his participation in the Speight Scheme. *SEC v. Flom*, No. 14-CV-5575 (MKB)(LB). The complaint alleged that Flom received wire transfers from investors, kept a two percent fee for himself, and transferred the money to Speight, who then sent investors counterfeit securities. The complaint alleged that Flom knew or recklessly disregarded that he was facilitating a fraudulent scheme. (Complaint in 14-CV-5575 (Doc. No. 1) at 2.)

Prior to trial in the criminal case, the government moved *in limine* to admit evidence of Flom's participation in the earlier Speight Scheme under Rule 404(b) of the Federal Rules of Criminal Procedure. (Motion *in Limine* in 14-CR-507.) The Court ruled at a pre-trial conference on June 16, 2016, that the evidence was admissible and agreed to provide a limiting instruction to the jury. *See United States v. Flom*, 256 F. Supp. 3d 253, 257 (E.D.N.Y. 2017) (describing 6/16/16 hearing, with reference to the transcript), *aff'd*, 763 F. App'x 27 (2d Cir. 2019).

Trial commenced on June 20, 2016. The government presented evidence of Flom's

participation in both the Speight Scheme and the 2013–2014 Sting. Witness Robert Thibault, an investigator for the Royal Bank of Canada in Montreal, testified to his 2012 investigation of a personal bank account Flom used; his subsequent meeting with Flom in Montreal on April 9, 2012, during which he warned Flom that "it was our conclusion that the account was used for the illegal sale of bogus securities"; and the closure of Flom's account at the bank and termination of the banking relationship. (Trial Transcript ("Tr.") (Doc. No. 70) at 49–69.)[2]

Witness Janell Beck testified that she bought securities from a cold caller between February and July 2013, wired approximately $65,000 to the "Jonathan Flom Special Account" at TD Bank in Palm Beach, Florida, and received certificates for Adfitech stock that had printing errors and turned out to be worthless. (Tr. at 99–108.)

An FBI agent using the pseudonym Max Larsen testified that the FBI began investigating Frank Speight and his company International Stock Transfer in 2012 and discovered that Flom and another attorney were maintaining bank accounts through which investor funds were transferred as part of this scheme. (Tr. (Doc. No. 71) at 142–43.) Larsen described the sting operation he set up with Speight, who was by then cooperating with the government, and who introduced him to Flom. (Tr. at 143–44, 153.) Larsen testified to a series of meetings, telephone calls, and email exchanges with Flom in which they discussed Larsen's purported experience in similar schemes and Flom's proposed participation in a new arrangement, for which Flom would get a five percent fee on all of the funds transferred through his accounts. The government played multiple recordings of these conversations at trial. Larsen testified about a meeting on September 26, 2013, at which he, Speight, and Flom discussed "speculative" work (Tr. at 160), "red flags" (Tr. at 164, 167), "building that comfort level" (Tr. at 165), "circling the wagons"

---

[2] The trial transcript is split into five documents and electronically filed at Doc. Nos. 70–72, 76–77. All citations to the trial transcript refer to the transcript page numbers, not to ECF pagination.

3

when confronted with customer complaints (Tr. 176, 190–91), concerns about bank regulators (Tr. 182–83), maintaining a "protected triangle" and tight circles (Tr. at 183, 187, 190–91), and loyalty among the three participants (Tr. at 193). Larsen testified that in subsequent telephone conversations on October 10, 2013, and December 6, 2013, and at a meeting on February 15, 2014, they discussed manipulating the price of Adfitech shares (Tr. at 199), printing of certificates (Tr. at 201, 235), "paying for discretion" (Tr. at 240–41), and "risky transactions" (Tr. at 241). He also testified that they role-played ways to handle complaints from disgruntled investors complaining about "worthless securities." (Tr. at 203, 235–39, 248–54.) Larsen also testified that he deliberately gave Flom reasons to be suspicious about the fraudulent activity and opportunities to walk away. (Tr. at 162, 175, 204, 231, 236–37, 252.)

On cross-examination, Flom's attorney ("Defense Counsel") asked Larsen if he had ever asked Speight whether Flom was aware of the fraudulent nature of the securities in the Speight Scheme, and Larsen acknowledged that he had not. (Tr. at 262.)

Thereafter, FBI Agent Adam Karczewski testified about the FBI's investigation into the Speight Scheme; electronic messages and telephone calls between Flom and Speight related to those transactions, an SEC audit, questions about the marketability of Altmark bonds and their failure to pay coupons; and two versions of a letter dated November 19, 2013, in which Flom represented that the Altmark bonds had paid coupons historically. (Tr. (Doc. No. 73) at 447, 458–74). Karczewski also testified to the FBI's initial approach of Flom on April 16, 2014. Karczewski testified that he played recordings of the February 15, 2014, meeting where, according to Karczewski, "Max Larsen tells him, just so you know, we're transacting in fraudulent securities." (Tr. at 451.) Karczewski testified that Flom told him: "What the recording doesn't show you is that I winced when he said that." (Tr. at 451.) Karczewski also

4

testified that Flom told him that he knew that Speight and Larsen were selling bogus securities, but that he thought his transactions only related to Altmark securities.  (Tr. at 452.)  On cross-examination, Karczewski stated that he informed Flom midway through the interview that Flom was a target of the investigation but did not advise him of his constitutional rights during that encounter.  (Tr. at 488–89.)  Karczewski testified that Flom agreed to cooperate in the investigation and signed a consent form agreeing to make recordings for the FBI.  (Tr. at 490–91.)  Defense Counsel tried to ask the witness about Flom's exculpatory statements and additional efforts to cooperate, but the Court sustained the government's hearsay objection.  (Tr. at 494–50.)

       The Court gave an instruction to the jury on the Rule 404(b) evidence that it was not to consider evidence of the prior relationship or acts between Flom and Speight as proof that Flom committed the crime charged in the indictment or as evidence of bad character or criminal personality, but only as an inference related to the defendant's knowledge and intent in the subsequent acts.  (Tr. at 524.)

       The government presented a final witness, FBI financial analyst Carol White, who testified to the bank transactions in Flom's TD Bank account between October 2012 and August 2013 and between December 2013 and April 2014.  Flom presented two character witnesses, but he did not testify on his own behalf.  Neither side called Speight as a witness.

       On summation, Defense Counsel talked about the presumption of innocence and the government's burden of proof (Tr. (Doc. No. 77) at 774); distinguished between the Larsen transactions that were part of the indictment and the Speight transactions that were not (Tr. at 778); argued that Flom was unaware of the fraudulent nature of the securities involved in the transactions he processed (Tr. at 782); and highlighted that the elements of the offense required

5

the jury to find that Flom believed that the proceeds were from unlawful activity (Tr. at 797–98).

The jury rendered a guilty verdict on June 24, 2016. (Jury Verdict (Doc. No. 69).)

Flom filed a post-trial motion pursuant to Federal Rules of Criminal Procedure Rule 29 and Rule 33, in which he challenged the sufficiency of the evidence and argued that the Court erred in admitting the testimony regarding the Speight Scheme, among other errors. (Motion for New Trial (Doc. No. 74).) The Court denied the motion, holding that the evidence was sufficient to support a finding of Flom's knowledge and intent with regard to his conduct in the 2013–2014 Sting and that the evidence related to the Speight Scheme was relevant and probative to Flom's knowledge and intent about the fraudulent nature of the transactions in the later arrangement with Larsen. *Flom*, 256 F. Supp. 3d at 266, 268–69.

Flom was sentenced on July 28, 2017. The Court found, under the preponderance of the evidence standard, that Flom had participated in the earlier Speight Scheme and knew that the funds he transferred were the proceeds of unlawful activity. (Sentencing Transcript ("Sentencing Tr.") (Doc. No. 112) at 24.) The Court held him responsible for all of the relevant conduct in the Speight Scheme and for the value of all of the funds laundered during both periods. (Sentencing Tr. at 40.) The Court calculated an offense level of 26, which was subject to a Guidelines range of 63 to 78 months. The Court then considered Flom's actual profit from the schemes and the disparity between the amounts laundered in the charged conduct and the prior relevant conduct and imposed a below-Guidelines sentence of 48 months' imprisonment and three years' supervised release. (Sentencing Tr. at 55.)

Flom appealed his conviction, (1) challenging the sufficiency of the evidence; (2) alleging trial court error related to the admission of 404(b) evidence and other evidentiary rulings; and (3) alleging errors in the jury charge. The Second Circuit affirmed the conviction on

February 27, 2019, holding, among other things, that sufficient evidence supported the jury's finding that Flom was aware of the fraudulent nature of the securities in the 2013-2014 Sting and that the Court did not err in admitting the Rule 404(b) evidence related to the Speight Scheme. *United States v. Flom*, 763 F. App'x 27 (2d Cir. 2019). Flom sought a writ of certiorari to the Supreme Court, which denied the petition on November 14, 2019. *Flom v. United States*, 140 S. Ct. 421 (2019).

The SEC civil enforcement action was stayed while the criminal case proceeded and during initial settlement negotiations. (14-CV-5575 Docket Order 12/08/2014; *see also* 14-CV-5575 Docket Order 4/11/2017.) On August 30, 2018, the SEC submitted a letter to the Court stating "Flom informed Commission counsel in late July 2018 that he was not interested in a settlement and that he intended to litigate this action." (8/30/18 SEC Update Letter in 14-CV-5575 (Doc. No. 47).) On April 12, 2019, the SEC filed a stipulation of voluntary dismissal dismissing all claims against Flom with prejudice. (14-CV-5575 (Doc. No. 64).)

Flom filed the instant 28 U.S.C. § 2255 petition ("Pet.") on November 1, 2019. The petition states: "A list of constitutional violations exist, among them Confrontation Clause, *Brady* violation, and Sixth Amendment due process" (Pet. ¶ 3), but it does not provide any factual allegations or legal arguments in support of these claims. Instead, Flom claims that the April 12, 2019, dismissal of the SEC's civil enforcement action "is an acquittance that reaffirms Flom's innocence" in the Speight Scheme. (Pet. ¶¶ 4, 23.) He argues that the evidence of his participation in the Speight Scheme should not have been admitted at trial or relied on at sentencing. He asserts that without this evidence, the government could not have proved scienter or intent in the 2013-2014 activities, and thus that he would not have been convicted of the charges in the sting operation. (Pet. ¶¶ 19, 26.) Moreover, he argues that even if he had been

7

convicted of activities from the 2013-2014 Sting, his sentence should not have been enhanced on the basis of the prior conduct in the Speight Scheme, and he should instead be found to have served a complete sentence under this reduced guidelines calculation. (Pet. ¶¶ 19–20, 24.)

In its opposition, the United States construes Flom's motion as alleging actual innocence based on newly discovered evidence and argues that Flom fails to present new evidence that meets the demanding standard of being truly extraordinary. (Response in Opposition re: Motion to Vacate under 28 U.S.C. 2255 ("Gov't Opp.") (Doc. No. 121) at 3–4.) Further, the government argues that freestanding actual innocence claims are not cognizable on collateral review, but rather must serve as a gateway to permit consideration of otherwise procedurally defaulted constitutional violations, which Flom does not raise here. (*Id*. at 3.) Finally, the government argues that even if actual innocence claims could be considered as freestanding claims, the dismissal of the SEC action with prejudice is not new evidence and addresses only Flom's civil liability for the Speight scheme, and thus it has no bearing on Flom's criminal conviction for different allegations arising from a different scheme. (*Id*. at 6.)

In his reply, Flom claims that the government improperly characterized his motion as asserting a freestanding actual innocence claim; instead, he asserts, it is the gateway to permit consideration of alleged *Brady* Due Process and Confrontation Clause violations. (Reply (Doc. No. 124) at 5.) In support of his actual innocence argument, Flom returns again to his argument that the Court erred in admitting the 404(b) evidence of Flom's participation in and knowledge of the fraudulent nature of the Speight Scheme, arguing that now that the SEC has dismissed its civil case against him with prejudice, "these acts [Flom's involvement in the Speight Scheme] could <u>not</u> be cast as misconduct – they are by acquittance, innocent." (Reply at 5.)

8

In his reply papers, Flom explained for the first time the basis for his *Brady* and Confrontation Clause claims. Flom states that he learned on October 30, 2018, that Speight had waived attorney-client privilege in 2013. (Reply at 2–3, 5, 7.) He now argues that the government's failure to turn over this information prior to trial was a violation of their *Brady* obligations, and prevented him from calling Speight's lawyers as witnesses. (Reply at 5, 7). Flom does not explain how these witnesses could have been helpful to the defense or could have changed the outcome of trial. Although Flom's reply also expanded on his Confrontation Clause argument, the papers failed to clarify this point. He states: "Government witness Karczewski's cross-examination, its own Confrontation Clause issue concerns his perjury … would have been treated differently by Flom's defense in light of Dismissal with Prejudice and the court having had Speights' waiver of Attorney Client Privilege" [*sic*]. (Reply at 7.) Flom claims that "the bank witness perjured himself throughout his testimony," and, when confronted on cross-examination, admitted that he "never told Flom of investor fraud." (Reply at 7.) Flom does not identify the allegedly perjurious statements or explain how he was prevented from impeaching the government's witnesses at trial.

## STANDARD OF REVIEW

Though Flom is proceeding *pro se*, he is also a lawyer. Accordingly, Flom is not entitled to the special solicitude typically granted to *pro se* litigants. *See Jaffe v. Capital One Bank*, No. 09-CV-4106 (PGG), 2010 WL 691639, at *2 (S.D.N.Y. Mar. 1, 2010) ("A lawyer proceeding *pro se* is not entitled to the special consideration that courts customarily grant to pro se parties." (citing *Harbulak v. County of Suffolk*, 654 F.2d 194, 198 (2d Cir. 1981)).

To qualify for relief under 28 U.S.C. § 2255, a petitioner must show that his "sentence

9

was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255.  Thus, "a collateral attack on a final judgment in a federal criminal case is generally available under § 2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice."  *Cuoco v. United States*, 208 F.3d 27, 30 (2d Cir. 2000) (internal quotation marks and citations omitted).  To meet this standard, the constitutional error must have had a "substantial and injurious effect" on the verdict.  *Brecht v. Abrahamson*, 507 U.S. 619 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *Underwood v. United States*, 166 F.3d 84, 87 (2d Cir. 1999) (*Brecht* standard applies to § 2255 petitions).

     Habeas review is limited.  "Because collateral challenges are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack."  *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010) (internal quotation marks and citation omitted).  "First, the so-called mandate rule bars re-litigation of issues already decided on direct appeal," including both "matters expressly decided by the appellate court" and "issues impliedly resolved by the appellate court's mandate."  *Id.* at 53 (citations omitted).  A second rule states that claims that could have been raised on appeal and were not are procedurally defaulted, unless the petitioner can show (1) both cause for failing to raise the issue previously and prejudice resulting from the failure to raise it previously; or (2) actual innocence.  *Id.* at 54; *see also Sapia v. United States*, 433 F.3d 212, 217 (2d Cir. 2005) (applying the *Yick Man Mui* rule statement to § 2255 petitions).

10

"Cause" is demonstrated by some "objective impediment" that interfered with the petitioner's ability to comply with the procedural rule, such as "a showing that the factual or legal basis for a claim was not reasonably available to counsel" during trial. *Gutierrez v. Smith*, 702 F.3d 103, 111 (2d Cir. 2012) (quoting *Strickler v. Greene*, 527 U.S. 263, 283 n.24 (1999)). Prejudice is shown "only if [the challenged defect] worked to the petitioner's *actual* and substantial disadvantage, infecting the entire proceedings with error of constitutional dimensions." *Yalincak v. United States*, 575 F. Supp. 2d 385, 387 (D. Conn. 2008) (alterations and internal quotation marks omitted) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).

## DISCUSSION

### I. Actual Innocence

"Actual innocence" is more than "legal innocence" or an assertion of insufficiency of evidence. *Poindexter v. Nash*, 333 F.3d 372, 380 (2d Cir. 2003), citing *Smith v. Murray*, 477 U.S. 527, 537 (1986). "For non-capital cases, actual innocence means that the petitioner in fact did not commit the crimes on which the calculation or imposition of his sentence was based." *Abdur-Rahman v. United States*, No. 09-CR-442 (WHP), 2016 WL 1599491, at *3 (S.D.N.Y. Apr. 19, 2016) (internal quotation marks, alterations, and citations omitted). "To establish actual innocence, petitioner must demonstrate that in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley v. United States*, 523 U.S. 614, 623 (1998) (internal quotation marks and citation omitted). This formulation sets an exceedingly high bar and ensures that a petitioner may only succeed on an actual innocence claim if his case is "truly extraordinary." *House v. Bell*, 547 U.S. 518, 537 (2006) (internal citations omitted).

Separate from establishing actual innocence as cause for a procedural default, neither the Supreme Court nor the Second Circuit has recognized a freestanding claim of actual innocence as a basis for habeas relief. *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."); *Florez v. United States*, No. 07-CV-4965 (CPS), 2009 WL 2228121, at *6 (E.D.N.Y. Jul. 24, 2009) ("[a]ctual innocence is not in it of itself a claim for relief"). "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying [] criminal proceeding." *Herrera v. Collins*, 506 U.S. 309, 400 (1993); *accord United States v. Quinones*, 313 F.3d 49, 67 (2d Cir. 2002) (citing *Herrera* and noting that actual innocence has not been held to provide an independent basis for habeas relief); *Frias v. United States*, Nos. 09CV-2537 (JFK), 01-CR-307 (JFK), 2010 WL 3564866 at *6 (S.D.N.Y. Sept. 13, 2010) ("[d]istrict courts ... have repeatedly held that a 'freestanding' claim of actual innocence based on newly discovered evidence, i.e., one unaccompanied by an allegation of some constitutional error, does not provide a basis for habeas relief" (citation omitted)); *Edwards v. United States*, No. 05-CV-0017 (NG), 2005 WL 1522743 at *3 (E.D.N.Y. June 27, 2005) (petitioner's actual innocence claim based on newly discovered evidence is not cognizable under § 2255).

The handful of courts in this Circuit that have recognized the possibility of a freestanding actual innocence claim have required an even more exacting standard than for gateway innocence claims. *See, e.g., Sweeney v. Laffin*, No. 12-CV-6483 (KMK), 2017 WL 4342138, at *7 (S.D.N.Y. Sept. 28, 2017) ("[E]ven if a freestanding actual innocence claim could warrant habeas relief, Petitioner has failed to make such a showing because the threshold for any hypothetical freestanding innocence claim [i]s 'extraordinarily high,' and such a showing

12

requires more convincing proof of innocence than the showing of innocence necessary [for a gateway claim]." (internal quotation marks and citations omitted)); *see also Adsit v. Annucci*, No. 16-CV-00817 (CMH), 2018 WL 1175090, at *6 (N.D.N.Y. Jan. 11, 2018) (describing the "extraordinarily high" standard and collecting cases).

Flom argues that the April 2019 dismissal of the SEC's civil enforcement case against him "reaffirms Flom's innocence" and is grounds to discharge his conviction or amend his sentence. (Pet. ¶ 4.) Though the government frames Flom's argument as raising a freestanding actual innocence claim, (*see* Gov't Opp. at 3), Flom disavows a freestanding actual innocence argument in his reply, stating, "the claim is the presumption of innocence coupled to permitted constitution issues." (Reply at 3, 5.) This statement suggests that, to the extent Flom is asserting "innocence," he intends his actual innocence argument as a gateway for considering claims that would otherwise be procedurally barred.

This claim fails. Flom argues that the subsequent dismissal of the civil enforcement action proves that he did not knowingly participate in the fraudulent activities in the Speight Scheme. Thus, he argues, the dismissal of the civil suit "has the effect of removing scienter, knowledge and intent from government allegation in the criminal case" involving the 2013-2014 Sting. (Reply at 4–5.) He cites two Supreme Court cases to support his contention that the dismissal of the SEC civil case should have the same effect as an acquittal for the instant conviction, neither of which support this claim. *See Nelson v. Colorado*, 137 S. Ct. 1249 (2017) (voiding a restitution order as a due process violation where the underlying criminal conviction was overturned); *Johnson v. United States*, 544 U.S. 295 (2005) (finding petitioner's one-year statute of limitations to challenge an enhanced federal sentence began to run upon the vacatur of a predicate state conviction). Further, his assertion that the SEC's decision not to pursue a civil

13

action should have the effect of barring any jury from considering his prior acts as anything other than categorically innocent is not a correct statement of law. The SEC dismissal does not prove "that the petitioner in fact did not commit the crimes on which the calculation or imposition of his sentence was based," *Abdur-Rahman*, 2016 WL 1599491, at *3, nor does it make it "more likely than not that no reasonable juror would have convicted him," *Bousley*, 523 U.S. at 623 (quoting *Schlup v. Delo*, 513 U.S. 298, 327–28 (1995)) (internal quotations omitted). The Court finds that the 2019 dismissal of the SEC civil suit, which occurred for reasons unclear, does not speak to whether or not he participated in or had knowledge of the fraudulent nature of the Speight Scheme, and certainly has no bearing on his conviction for his conduct in the 2013-2014 Sting. Accordingly, this argument fails.

## II. Flom's Constitutional Claims

Flom's petition also asserts the following constitutional claims: that the admission of the 404(b) evidence and the non-disclosure of Speight's waiver of attorney-client privilege violated his Fifth Amendment right to Due Process and that the limitations on cross-examination of the government's witnesses violated his Confrontation Clause rights under the Sixth Amendment.

### a. Admission of Evidence

Flom has already extensively litigated his claim related to the admission of the 404(b) evidence, in pre-trial motions, at trial, in his Rule 29 and Rule 33 Motion, and on appeal. Because Flom raised this argument in his direct appeal and it was rejected on the merits, under the mandate rule, he is procedurally barred from raising it in his § 2255 petition. Further, Flom fails to argue cause and prejudice to overcome this procedural bar, and neither are present here: Flom cannot show cause for failure to raise his 404(b) claim when he did, in fact, raise precisely

14

that claim repeatedly; and he cannot show prejudice where, as discussed further below, the admission of evidence of the Speight Scheme was squarely within the bounds of 404(b).

Moreover, even if the Court could consider this claim, it is without merit. Prior to trial, the Court granted the government's motion *in limine* seeking admission of the Speight Scheme evidence. (*See* Docket Entry Order dated 6/16/16.) The Court granted this motion because the prior scheme was probative and relevant to the development of a relationship between Flom and Larsen, and showed that Flom understood that the transactions were fraudulent; on review of Flom's post-trial motions, this Court again found that this evidence was more probative than prejudicial and any prejudice was mitigated by the limiting instructions given to the jury concerning the proper use of the evidence in deliberations. *United States v. Flom*, 256 F. Supp. 3d 253, 257, 268 (E.D.N.Y. 2017), *aff'd,* 763 F. App'x 27 (2d Cir. 2019) (citing 6/16/16 Transcript.) The Second Circuit affirmed, finding that the district court properly admitted the evidence as relevant to Flom's knowledge of the fraudulent nature of the securities offered in the 2013-2014 Sting and did not abuse its discretion in finding that the evidence was more probative than prejudicial. *United States v. Flom*, 763 F. App'x 27, 30 (2d Cir. 2019). Indeed, Flom argues "that the government could not have proved scienter or intent in the 2013-2014 activities" without the Speight Scheme evidence, (Pet. ¶¶19, 26), thereby admitting that the evidence falls squarely within the permitted use of crimes or wrongs as enumerated in Rule 404(b)(2). *See* FED. R. EVID. 404(b)(2) ("This evidence may be admissible for… proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.") The Second Circuit also found that "any arguable error was mitigated by the district court's limiting instruction to the jury that the prior scheme was not to be considered as proof that Flom

15

committed the charged crime." *Id.* Accordingly, even if this claim were not procedurally barred, it would be denied.

### b. *Brady* Material

In his response to the government's opposition, Flom asserts that his right to Due Process was violated because the government did not disclose prior to trial Speight's 2013 waiver of attorney-client privilege, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Flom did not previously raise this claim on appeal, thus it is procedurally barred from habeas review unless Flom can show both cause and prejudice for failing to raise the issue previously or actual innocence. *See Yick Man Mui*, 614 F.3d at 53. As already discussed, the Court rejects Flom's actual innocence argument. Moreover, though Flom claims that not knowing of Speight's waiver of attorney-client privilege "prevented [him] from – at trial – calling Speight's lawyer as witness," (Reply at 4), which may demonstrate cause, he fails to make the requisite showing of prejudice to overcome procedural default. He does not explain what non-hearsay testimony he could have elicited or how not calling this witness caused any prejudice. Accordingly, the Court finds that Flom has failed to meet the cause-and-prejudice standard to overcome the procedural barrier to raising his *Brady* claim on collateral review.

Moreover, even if Flom were able to satisfy his burden of showing prejudice and the claim could be heard on habeas review, he has not demonstrated a *Brady* violation. "In *Brady*, [the Supreme Court] held 'that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Strickler*, 527 U.S. at 280 (quoting *Brady*, 373 U.S. at 87). *Brady* applies to exculpatory and impeachment evidence, but the evidence is only considered material "if there is a reasonable probability that,

had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 676, 682 (1985). Flom has not shown that the new evidence of Speight's 2013 waiver of attorney-client privilege was *Brady* material and that disclosure would have affected the outcome of the proceeding. Flom speculates that Defense Counsel might have called Speight's former attorney as a witness, but he has not explained how any such testimony would have been admissible or helpful, either to exculpate Flom or to impeach any of the government's witnesses. Accordingly, Flom's *Brady* claim based on the alleged non-disclosure of Speight's waiver of attorney-client privilege would also be dismissed on the merits.

### c. Confrontation Clause

In his response to the government's opposition, Flom also asserts Confrontation Clause violations. Flom did not previously raise this claim on appeal, thus it is procedurally barred from habeas review. As explained above, the Court rejects his actual innocence argument and his cause-and-prejudice argument related to the late discovery of Speight's waiver of attorney-client privilege. Even if the Court could consider this claim, it is wholly without merit.

The Sixth Amendment's Confrontation Clause guarantees the right of a criminal defendant to confront the witnesses against him, which includes the right of cross-examination. *Davis v. Alaska,* 415 U.S. 308, 315–16 (1974). "While the Confrontation Clause affords 'an opportunity for effective cross-examination,' that does not equate to 'cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *United States v. Barnes*, 560 F. App'x 36, 40 (2d Cir. 2014) (summary order) (quoting *United States v. Owens*, 484 U.S. 554, 559 (1988)). "Trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on [ ] cross-examination. . . ." *United States v.*

17

*Crowley*, 318 F.3d 401, 417 (2d Cir. 2003) (quoting *Delaware v. Van Arsdall*, 473 U.S. 673, 679 (1986)). A defendant may get relief "[o]nly when this broad discretion is abused." *Id.*

In this case, Flom does not identify any Confrontation Clause violation. He claims that Karczewski and "the bank witness" committed perjury, but he does not identify any allegedly perjurious statements or explain how he was prevented from impeaching the government's witnesses. First, Flom implies that had he known about the subsequent dismissal of the civil case and Speight's waiver of attorney-client privilege, he could have cross-examined Karczewski about the "targeted interrogation without *Miranda* warning." It is not clear how these issues are related. Defense Counsel did elicit Karczewski's testimony that he told Flom that he was a target but did not warn him about his *Miranda* rights. The Court properly limited Defense Counsel's cross-examination when Counsel sought to question Karczewski about inadmissible hearsay statements made by Flom.

Next, Flom claims that "the bank witness" admitted that "he never told Flom of investor fraud." It's not clear what testimony Flom is referring to or how this supports a Confrontation Clause claim. Thibault, who formerly worked at the Royal Bank of Canada, testified that he told Flom that the bank believed that Flom's account was being used in the sale of bogus securities. Defense Counsel did not challenge Thibault's testimony and was not limited in his cross-examination of this witness. The government's final witness, Carol White, was an FBI financial analyst who testified about the transactions in Flom's TD Bank account. Neither of these witnesses admitted that they "never told Flom of investor fraud." Accordingly, any claim based on the Confrontation Clause is without merit and would be dismissed.

## CONCLUSION

For the foregoing reasons, Flom's motion to vacate his conviction and sentence pursuant

18

to 28 U.S.C. § 2255 is DENIED. Because Flom has not made a substantial showing of the denial of any constitutional right, a certificate of appealability shall not issue. *See* 28 U.S.C. § 2253(c)(2). The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Memorandum and Order would not be taken in good faith, and therefore, *in forma pauperis* status is denied for purpose of any appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

      The Clerk of Court is directed to enter the accompanying Judgment, mail petitioner a copy of said Judgment and this Memorandum and Order, note the mailing on the docket, and close case number 19-CV-6476.

                                                      SO ORDERED.

Dated: Brooklyn, New York
       January 11, 2021                           *Roslynn R. Mauskopf*

                                                      ROSLYNN R. MAUSKOPF
                                                      Chief United States District Judge